May it please the Court. Good morning, Your Honors. My name is Charles Ferreira. You have to move the mic a little closer, Mr. Ferreira. Thank you. Welcome to the mainland. Thank you, Your Honor. Because the case involves two fact-intensive issues, one, a sanctions motion, and two, a motion for summary judgment, I would like to give the Court a very pithy, brief recitation of the facts so that we can stay focused on what it is that the standards were to have been applied to. In the late 60s and early 70s- We've all really read the facts, and I don't want to discourage you from doing that, but I think we may have some direct questions that your time might more profitably- Let me ask you this to start with. On the sanctions motion, I understand your point, but I'm not sure we've ever reversed a district court for failing to impose terminating sanctions. We've reversed district courts for imposing terminating sanctions. Do you have a case in which- No. Not one? No. That's a pretty big leap. I'm not saying that you don't have a cause, necessarily, but it's- What's your best argument that it's an abuse of discretion for a court, even if sanctions are required for not reversing a court for not imposing terminating sanctions? Well, first off, Your Honor, as to sanctions in general, Judge White used a standard of willfulness, bad faith, and those-that's not the law under Kahlilu or under fair housing. The standard is whether- Well, fair housing just sort of added to it. I mean, it's not. I sat on fair housing, so I'm familiar with it. Right. I know. But the point is, Your Honor, the standard that the district court is supposed to use in assessing whether or not there was sanctionable conduct under Rule 37 is, was there disobedient conduct not outside the control of the litigant? And so that's how the court is supposed to assess first, was there sanctionable conduct. And then after that, the five factors can be applied to determine the degree. Well, isn't the remedy, if we agreed with you, isn't the remedy to remand and have the district court reassess sanctions rather than hold the district court erred and not giving terminating sanctions? I mean, that's the death sentence of a lawsuit based on the conduct of a party, and we have to take those cases pretty seriously. So that's the context in which I'm asking the question. And, Your Honor, in Kahlilu, this Court, even though the judge below had imposed sanctions, had not gone through the five factors, but this Court went through the five factors itself. And so I submit that there is precedent for this Court addressing the five factors above where they haven't been addressed by the district court. But I do agree with Your Honor, I can find no case where a circuit court reversed the district court for failing to impose terminal sanctions. Turning to the substance of the summary judgment motion, if you don't mind, on the copyright violation, I gather from the briefing that you can't show a copyright violation unless you get discovery. That's the basic. Yes, Your Honor. I mean, if we affirm the district court's denial of your 56-F motion, that's it for the copyright violation, right? Yes. No rises or falls on that. That's true, Your Honor. Our experts from the beginning filed declarations which set forth the information that they needed in order to analyze the program. Because to see it as analyzable under this literal standard, as, say, Mr. Johnson Laird advocated, is folly. Our program was written in C language. This program is written in C++. So the kind of analysis that Mr. Johnson Laird advocated would never turn up copying no matter what was done. So we need discovery of the development, design, architectural files so that we can see what they did and when they did it. Because as the court knows, you know, we gave our K2 program to Aldis. Four months later, Adobe bought Aldis. Four years later, Adobe came up with a program called K2, the same name that performed the same functions as our software. And by the way, Your Honor, the software that was initially searched where those 50 STIs came up, that was early on in the case before suit was filed. Before you get to the by the way, you skipped over a point that I don't fully understand. Maybe you can explain it to me. No one is being critical of a district judge who decides how much discovery until you get to a dispositive motion so that the whole house isn't open for something that can be disposed of earlier. We teach them that all the time. So the process itself is acceptable.  Now, as I read the briefs, the district court was asking your client to provide declarations in order to show that you needed more sanctions. Now, the briefs say those were never filed. You just told us that you had already pointed out in declarations why you needed and what you needed in discovery. Yes. Mr. Allapin's declaration, Your Honor, specifically says in order to analyze a program of this magnitude that he required the design, development, architectural files. And, you know, the point is, Your Honor, that the task without that is just it's insurmountable. And that's what all of our experts had said. So we knew what we needed. But Judge White disallowed that. And, you know, while I'm on the subject of the record, volume 270, page 74, there's an indication in there that Brookhaven did not submit any of the declarations requested by the court. Your Honor, Brookhaven submitted approximately ten declarations by expert witnesses. And I have the citations where the declarations are. But Brookhaven could not submit a declaration by an expert witness which said, we have found indicia of copying in the Adobe code. That's the dec the judge judge wasn't saying that we produced no declarations because, in fact, we produced approximately ten expert declarations. What he was saying was you don't have an expert declaration that says that your experts see some indicia of copying in this code. Okay. So what you're suggesting is that the district court was asking for something that was an abuse of discretion for you for the discovery that you wanted to do. And he said you have no foundation. Yes. You're saying that was an abuse of discretion to make that limitation? Yes. Because, in effect, the district court was asking us to sort of prove our case before we got any discovery. And we had been through a 12b-6 motion. And so we were just asking for the basic documents that are part of a case like this, the design, architectural documents that show how it is that a company like Adobe creates this piece of software to see if there was indicia of their having used our software. Now, if we move to the misappropriation account, that's a little bit different. It's totally different. And that is, I gather, that is not dependent on, although you'd like more discovery, that's, in your judgment, not dependent on the granting of 56F motion. Is that right? Yeah. Well, depending on what Your Honor means by that, I would just submit this point. If, for instance, Adobe had our K-2 software in its vaults, and there was a memo in the Adobe vault that said, good thing we got Roser's K-2 software because we never would have been able to build InDesign without it. If there was a memo like that in their file, we'd never get a chance to see it because we can't even send out an interrogatory. And so a misappropriation claim is a totally different claim from a copyright claim. Right, right. I mean, you'd like more discovery. But I gather your position from your brief is that you've got enough in the record without further discovery to create a genuine issue of material fact, correct? Well, yes, because we gave our software to Aldis. Adobe acquired Aldis. There were 50 STIs in the K-2 software that Adobe had, 50 STIs in ours. And that, by the way, is one of the types of analysis that Mr. Johnson Laird advocated, and that's called emblem analysis or token analysis, where you take a short string of letters, in our case STI because that was the name of the company, Scientific Typesetters Incorporated, and then you see if that's in the two places. And if it is, then that's an indicia that there's some similarity. And that piece of software – Why would the STI have been embedded in there? Just as sort of a code, like a watermark or something? No. It could be in certain cases. In this case, it was part of a code that – a token that the STI company used for some of its data. And it happened that there were 50 STIs in ours and 50 STIs in the piece of code that Adobe showed to us that was their K-2 code. And that piece of code – That's not a comment line. It's something different. It's not exactly, Your Honor, because, you know – Well, what the STIs are in the Adobe's code has been represented to be different things. Early on, Adobe said STI means path in Danish. And by the way, Your Honor, I would like to reserve a couple of minutes for rebuttal. All right. You're getting close to it, so – STI means path in Danish. That's how they justified the fact that the word STI was in their code, which is obviously – So you've got 50 instances of STI in both codes. You also claim that the proportion of the scalable fonts was the same. Yes. What else do you have that's an edition of trade secrets at this – based on this record? Those are the main ones, Your Honor. Okay. I think we have your argument in hand. Do you want to save the rest for rebuttal? Yes, Your Honor. Okay. Good morning, Your Honors. Let me turn first to the issue of the sanctions. And I think the Court has correctly hit the issue, which is there is no case that we are aware of where this Court has said to the district court it was improper for you not to impose terminating sanctions. There are cases where this Court has reversed, where the district court has imposed terminating sanctions and sent it back, and that's the situation which we had in this case. This issue of the appropriateness of the standard, if you look back and you look at the cases, if you look at Adriana or you look at Connecticut general life insurance, the cases are clear that where the district court is faced with the issue or the question of whether or not to impose terminating sanctions, the standard is indeed willfulness, bad faith, or fault. And that is the standard that Judge White applied. If you look back at his order, he was very thoughtful. He was very considerate as he went through the issue. And what the plaintiffs were asking, truly in this case, because of, and we'll talk about in a moment, in connection with the summary judgment, their inability or their failure to come forward with any evidence, any indicia whatsoever of copying or misappropriation of trade secrets, they asked the Court to win by default. They did. But let me get directly to the issue of this source code. As I read through this, it doesn't appear that their expert really had a final opportunity to look at compilable, runnable product. Now, your expert says, well, they don't need that, but they said they did. And I understand their argument because you've got C here, C++. They're different languages. If you just look for, do a search for a word, you're not going to turn up substantial similarities. It's like comparing Chinese and French of the same document. If you're looking for the particular character, it's not going to come up. So why shouldn't we send this back down and say, grant the 56-F motion, let them have their chance to a compilable, runnable product, and let them do their analysis and put up or shut up? Certainly Judge White had the authority or the discretion to impose this procedure, which he did, in which the plaintiffs stipulated to, which was the initial exchange of the codes. There is a dispute. And if you look back, I mean, the declarations on this issue of compilability are huge. But if you look back at those, actually there is a concession by their expert, Mr. Henderson, that he did indeed, with the assistance on 1.0 and 1.5, have the opportunity and did compile 1.0 and 1.5. Well, he compiled it, but he didn't get it in a runnable form. Now, to me, saying that a compilable and not runnable is, you know, if you say, well, we gave them a compilable version, but you couldn't run it, it's kind of like, I was reading this and saying, well, that's like asking my kid, you know, would you put the milk away? And he says, it leaves it out on the counter. And you say, well, you didn't say put it in the refrigerator. I mean, it's not functional for most people if you don't give them the DLL files, right? Well, they were indeed given the DLL files. And I mean, that is an issue, again, which was subject to a great deal of debate and dispute in the lower court. And Judge White sat through the entirety of that debate and dispute. And if you look at what happened at the end, the DLL files that they needed to both compile it, to execute it, compile it, and then run it were all made available to them. But to this day, they say they can't run the program. I appreciate that's what they say, but you have to look back at what the factual dispute was, and that was the dispute that was before Judge White. And what Judge White was not saying to Brookhaven was to prove the entirety of your case. All that he was saying, both in his initial protocol and in the motion for summary judgment, when they made the first request under 56F to continue the hearing, he granted that. And he said, come forward with some more DLL. What he was saying to them was, come forward with any indication of substantial similarity.  That's all. They basically can't do the analysis according to that. Well, they have said they cannot or will not or. Well, I understand their theory, which is you need to start running the program and stop it and see what's happening at various junctures of the code, and then you can look at the code there, rather than trying to sort through it through different languages. I mean, I understand their point. Whether or not, you know, they had ample opportunity in four years is another question, but it seems to me they can't prove their case without the information. And the question is whether. It may not be there. I don't know. The question is whether it's an abuse of discretion by the Court to impose that requirement upon them. And if you look back at the cases that we've cited in our brief, there are cases that are analogous where the Court has given additional time to a Respondent to a motion for summary judgment to come forward with any evidence. There was the case involving the person who was given 10 days to go back and find the documents, couldn't find them. That's the situation we had here, which was over six years, literally, when the case was filed in 2001 in April to April of 2007, when the motion for summary judgment was granted. Extensive opportunities were given to Brookhaven and to its – it had four experts. And at the very end, when you look – it's very telling when you look at Mr. Alpin's declaration that he submits in, I guess, an opposition or to support the request for the discovery. He says, I have this conflict which has arisen. So they were asking for yet another expert. I think that is something that Judge White can take into consideration as he looks at this inability or refusal to do the work that he has requested of them to do. You know, if you turn to the trade secret issue and you look at the declaration that Andy Johnson Laird submitted, he went through each and every one. I've forgotten how many trade secrets were disclosed by Brookhaven. He went through each and every one of those trade secrets and said either they are not in the code or they are not protectable. Now, what they say they want now is to go back and hypothetically look for a memorandum to do some discovery. Well, under a trade secret claim, there are two issues. One is access, and that could go to this issue of the memorandum. But there's also this question of whether there is any copying or theft or misappropriation. And what Judge White was saying, again, with respect to that claim, come forward with any indicia, come forward with any, and then I will let the case proceed. So he came up with two. They had two pieces of evidence, which counsel has alluded to today. And the scalable fonts or the proportional fonts and the fact, the circumstantial evidence of the two meetings. Now, the scalable fonts or whatever the proportional fonts are may be thin, but why is that enough to create a genuine issue of material fact? It would go to the amount of damages. I mean, it's a small trade secret they're claiming large. Why is that enough to create a genuine issue of material fact? I think because Judge White found that they had not created a genuine issue of fact. He looked at that evidence. He looked at that portion of the declaration. This was argued at the hearing on Senate judgment. And he basically said, you have not come forward with sufficient evidence. When the burden shifts, you know, under the Celotex case, we came forward with our declaration from Judge, from Johnson Laird. It shifts to them. And he said, you have not met your burden of coming forward with any substantial evidence to support your theory of trade secrets.  That was litigated extensively. In fact, even before the motion for summary judgment. And again, he found that that was not sufficient evidence. And the question then becomes, is it an abuse of his discretion to do that? You look at it. No, of course. And he is the person, obviously, who has sat through the six years of discovery and is in the best position to do that. And what he found there was that this one instance of fonts out of the, I think to go forward on the discovery that they requested. Could I ask a question on this discovery issue? I'm sympathetic with the situation the district courts face to try and not spend a year on a case that can be disposed of in a month if discovery is controlled. So that's not my problem. My problem is the district court required Brookhaven to submit a declaration requiring what discovery would be necessary to make the determination. And as I understand it, no declaration was filed. What is it the district court wanted? Now, in fairness to Brookhaven, declarations were submitted that purported to set forth the Rule 56 discovery that they wanted. The declarations that were not filed were at the very beginning when Judge White established his protocol. He said, I want the codes exchanged. I want each side's experts to look at the code and compare them and come forward and tell me, is there any evidence on the copyright of substantial similarity or on the theft of trade secrets, is there any indicia or evidence that there had been a misappropriation? What he wants to do is have evidence to show I can go get more evidence in discovery. No, I think what he wants to do is have evidence to show I can go get more evidence until you have discovery. Well, that's the debate in this case. We think there was discovery. We think there was six years of discovery because in this type of case, in a copyright case or a theft of trade secrets, the most critical evidence obviously is the code. And they were given the code. They were given access, and we can debate DLLs and make files and compilers. They were given access to all of that. They were given access to our experts as well. I disagree. I don't think the record shows that Adobe was always so giving. It cost you $2,500 when you weren't too giving. So I can see there's a little adversary problem going on there. But your contention is that you did give everything that was necessary and requested. Our contention isn't. Then the district court wanted more. He wanted specific facts to lead to other discovered facts. No, I don't think that's what he was asking for. He was asking for the declaration, the expert reports that he requested in the very first establishment of the protocol, which was the expert report to come forward with some evidence of either the similarity between the codes or the theft of trade secrets. The criticism also raised by the district court was that Brookhaven did not take advantage of Adobe's experts. Correct. You mean by deposition? No, this was when we talk about was there any discovery, the court, I thought, initiated a rather novel approach, which when this issue about compilability and could the code be compiled, the court offered to Brookhaven access to Adobe's expert, Andy Johnson Laird. And he said, I want Mr. Laird first at the cost of Brookhaven, and then later it was to be shared. I want him to assist Brookhaven's experts to finally come forward with or to solve this issue of compilability. So we actually had we had a hearing in Judge White's courtroom where the court's own technical expert was there, and then we had a telephonic hearing, and this is all in the record and in joint statements of what happened at the telephonic hearing where Andy Johnson Laird literally on the phone walked Brookhaven's expert, Mr. Henderson, through the steps to compile it. And this is in the declarations. He literally said, open this file. Now copy it to that file. Now put in this instruction. Now do that. Okay. This is discussion between experts on each side. Correct. If I may, to follow up on Judge Wallace's question, if I'm reading the record correctly, and I've just read what you've submitted, I haven't, obviously we don't parcel. I don't think, this wasn't a case where there were a lot of deposition testimony, right? There was none. No, no depositions. That's correct. And it appeared that Judge White structured this as you might a patent case where you let the experts sort it all out before you do anything else. Is that a fair characterization? I think that is. And what distinguishes this case from Phillips, which both sides have talked about in the briefs, in Phillips the case was filed. The Court put into play a discovery plan. Before there was any discovery, the defendant moved for summary judgment. And there the plaintiff said, it's unfair. I haven't had any discovery. And what the Court said there was, in reversing and sending it back, had there been some evidence produced by the defense, for example, affidavits or documentary evidence, we then might have changed our mind and required the plaintiff to come forward with some evidence of its case. And that was exactly the situation here. We actually did come forward with some evidence, and I think extensive evidence, in the form of the declarations from Andy Johnson Laird. And what the Court was then saying, what Judge White said was, plaintiff, come forward with some evidence of your case. And that's what they didn't do. Well, the difficulty I have with that is on the trade secret count, because normally one would allow full deposition discovery on a trade secret case as opposed to a pure, say, patent or copyright case where you might close down discovery. Did Judge White prohibit depositions until the ---- Well, again, he had the same protocol, the same procedure for the trade secret claim, which was exchange the codes because ---- well, first I take that back. He actually required them to give us a list of their trade secrets, and there was debate back and forth whether they had complied. We ultimately got a sufficient list of the trade secrets, and then he said to the experts, take the code, compare it to the list of trade secrets, and tell me what, if anything, you find that has been misappropriated. Did he allow conventional interrogatories? No, he did not. So no interrogatories, no deposition, testimony allowed, requests for admissions, did he allow those? No, he ---- the protocol that he put in was the one of exchange of the list, exchange of the code, and expert analysis. Okay. Counsel, just for my curiosity, is there any evidence that STI means path in Danish? There is evidence in the declarations from Andy Johnson Laird. Okay. Nobody's actually ---- has anybody bothered to look at a dictionary or give us the word?  And I take it that Adobe sort of abandoned that claim. Well, there was this entire issue about how many instances of ---- I understand that we had the 50 STIs in the codes, and it comes up in one of the initial exchanges of letters, I think, between outside counsel, but it doesn't appear that anybody's defended the proposition that STI means path in Danish. No. No, Your Honor. Okay. In your 22 seconds left, maybe you can tell me. I didn't get in the trade secret misappropriation, what idea should be protected. Was that ever identified? Well, there was an extensive list of trade secrets that were ultimately exchanged between Brookhaven and Adobe. So they had a long laundry list of what they purported to protect. At the end of the day, in response to the summary judgment, at best what they said was this issue of there was some similarity between the fonts. Right. I mean, I think their theory, though, was different. I mean, if I understand their theory, they were saying it was the logic or the algorithm of the initial program that they were trying to protect, the idea of it, rather than any particular code, which would be a straight copyright. Is that the way you viewed it? Well, that's not the way that I read their trade secret disclosure. That may have been the way that they argued it as they tried to pose the summary judgment, but that was certainly not disclosed as a trade secret in the list that they prepared. Okay. Any further questions? Okay. Thank you, Your Honors. Your Honor, no interrogatories, no admissions, no requests for production of documents. You have to move closer to the next. No discovery whatsoever. On the at one point, Judge White authorized us to take the deposition of Mr. Fogelsang because Mr. Fogelsang had signed a declaration, Mr. Fogelsang had worked on it for Adobe, saying that the piece of code that had the 50 STIs in it should still be in Adobe's files. And so at first, Judge White said we could take Mr. Fogelsang's deposition, then he refused. We even made motions to do discovery. There's no such thing as a motion to do discovery, but we just did it. Well, the district courts have a fair latitude on discovery, managing discovery, too, and we just have to decide whether it's appropriate in this case. But let me ask you this. If we just take what's on the record now, tell me why you think the 50 STIs and the scalable fonts are enough to get you to a jury on misappropriation. Well, just, you know, I don't want to abandon the fact that we weren't going to do the discovery. You're not. I just want to focus on that. Because, Your Honor, in software cases, the earliest version that the defendant has of the offending software is the one that's most likely to have your code in it in the form that your code was. That's just common sense, because as the version morphs, your code can get more and more and more and more changed. And so this 50 STIs in the early version was very telling, because that's – because how – that, you know, think about the likelihood of the coincidence of taking two pieces of software code, arbitrarily choosing STI and finding that they have the same number in them. So we thought that was very telling just in and of itself. And the fact that that piece of code, which Mr. Fogelsong said in his declaration should be with Adobe, has never been found, is also very, very telling to us. So that's enough, we think, to establish our right to go forward with the trade secret case, but we sort of reiterate that having been deprived of any discovery on that case was also – was an abuse of discretion. Who did you want to depose to provide proof for your trade secret case? I mean, generically types, not – I don't want the names, because they won't mean anything to me, but generically. Well, you know, the searcher for the STIs, Mr. Fogelsong, Mr. Haberman, who was the person who went and looked for the STIs and who did the early memorandum that we talked about on – Okay. That gives me a – Yeah, people like that. There were people like that. I just wanted to also address that the font issue on the motion for summary judgment wasn't really related to the trade secret issue as much as the copyright issue on the motion for summary judgment. It would give some indicia for the trade secret case, but it was mostly lodged for the copyright case. And as far as six years ago, we didn't get the make files until February of 2004 when we discovered that they hadn't given us the libraries, which then were supposedly given to us in December of 2005. So it took us five years to get the make files and the libraries, although we never really got access to the code of the libraries. So the idea that we had complete and compilable code for six years is not true, Your Honor. We didn't. We spent tens of thousands of dollars each time we got a production from Adobe showing that it wasn't what the court had ordered them to produce, and we'd have to go through hearing after hearing after hearing. So – Did your expert ever do – use a source code program comparison, as Adobe suggested that he should? Yes, but not – the kind of – okay, yes, we absolutely did. I mean, we did the token search. We did that. And that's what we did with both Mr. Henderson and Mr. – two of our experts did token searches. This literal string matching – Right. But, I mean, I gather your contention is you can't do it with C and C++. That's – Are you claiming there's no software that could do that? No. I know it's a procedure. No, in fact, my expert – I mean, Ronald Allepin told me that what Mr. Johnson later was advocating is more difficult than what's called the chess problem, which is – that's the deep blue program that beat Kasparov in 95. He said to me, what they're asking you to do here is harder than what IBM had to do to beat Kasparov. It's a bigger project. So it was impossible. That's – for this – if you have a – two tiny programs, you can do that. If you have a program with a million and a half lines of code, it's what – it's an NP-complete problem is what – it becomes factorial, and like that, you're into the trillions and trillions and trillions and trillions of iterations. So it's fated to be impossible. The methodology must fail. Okay. You're taking over your time. Any further questions? Okay. Thank you. Thank you for your argument. Thank you both for your arguments and presentations. The case just heard will be submitted.
judges: Wallace, Thomas, Bybee